## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TODD L.,[1] | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 3:25-CV-106-MAB[2] |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Todd L. is before the Court,
represented by counsel, seeking review of the final decision of the Commissioner of Social
Security denying his applications for Disability Insurance Benefits (DIB) and
Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. For
the reasons set forth below, the Commissioner's decision is REVERSED and this matter
is REMANDED for rehearing and reconsideration of the evidence pursuant to sentence
four of 42 U.S.C. § 405(g).

### PROCEDURAL HISTORY[3]

Plaintiff applied for DIB and SSI in April 2007, alleging disability beginning on
September 15, 2006 (Tr. 386-390). Plaintiff's DIB and SSI applications were denied at the

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order
due to privacy concerns. *See* FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28
U.S.C. § 636(c) (Doc. 21).

[3] The Court has attempted to summarize the lengthy procedural history of this case as succinctly as
possible. As such, many aspects of this case's procedural history that are not directly relevant to Plaintiff's

initial and reconsideration levels, and then by ALJ Don Harper in April 2010 (Tr. 130-142) after a hearing was held one month earlier (Tr. 552-577). Meanwhile, Plaintiff filed another claim for disability insurance benefits in June 2010 which was granted at the reconsideration level (Tr. 144-147). Due to the inconsistent rulings, in August 2011 the Appeals Council vacated and consolidated both the unfavorable decision from April 2010 and the favorable decision on Plaintiff's subsequent June 2010 application (Tr. 144-147).

Thereafter, another hearing on Plaintiff's applications was held in 2013 (Tr. 578-616), which resulted in ALJ Anne Pritchett issuing an unfavorable decision in July 2013 (Tr. 154-172). However, that decision was vacated and remanded by the Appeals Council in February 2014 (Tr. 173-175). On remand, ALJ Stuart T. Janney held a third hearing in May 2014, wherein Vocational Expert Matthew Sprong appeared and testified (Tr. 617-668). ALJ Janney issued an unfavorable decision on July 9, 2014 (Tr. 176-198). Plaintiff appealed the decision to the Appeals Council, but on that occasion the Appeals Council denied his request for review (Tr. 199-201). Accordingly, Plaintiff appealed the July 2014 decision to this Court, which ultimately reversed the Commissioner's final decision and remanded this case back to the Commissioner for rehearing and reconsideration of the evidence on February 8, 2017 (Tr. 203-223). *See also Lauster v. Berryhill*, 15-CV-1134-JPG-CJP, 2017 WL 513663 (S.D. Ill. Feb. 8, 2017).

---

claims have been omitted. For a detailed recollection of this case's procedural history, see the administrative transcript found at Doc. 23 (Tr. 1-697), as well as this Court's prior opinion, *Lauster v. Berryhill*, 15-CV-1134-JPG-CJP, 2017 WL 513663 (S.D. Ill. Feb. 8, 2017).

Pursuant to this Court's Order, ALJ Janney held another hearing on November 20, 2017 (Tr. 93-129). At that hearing, Plaintiff appeared with counsel and Vocational Expert James Bordieri also appeared (Tr. 93-129). On February 16, 2018, ALJ Janney issued an unfavorable decision (Tr. 28-77). Thereafter, Plaintiff filed exceptions to the ALJ's decision (Tr. 239-240). Ultimately, on December 4, 2024, the Appeals Council declined Plaintiff's exceptions, leaving the ALJ's 2018 decision as the final decision of the Commissioner and providing Plaintiff with 60 days to file a civil action seeking judicial review (Tr. 1-4). This appeal followed on January 24, 2025 (Doc. 1).

**APPLICABLE LEGAL STANDARDS**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[4] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4). The first step is to determine whether the claimant is presently engaged in substantial gainful activity. *Id.* at § 416.920(a)(4)(i). If the answer is yes, then the claimant is not disabled regardless of their medical condition, age,

---

[4] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, of the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

education, and work experience. *Id.* at § 416.920(a)(4)(i), (b). If the answer is no and the individual is not engaged in substantial gainful activity, the analysis proceeds to the second step. *Id.* at § 416.920(a)(4).

At step two, the ALJ considers whether the claimant has a medically determinable physical or mental impairment, or a combination of impairments, that is "severe" and expected to persist for at least twelve months. 20 C.F.R. § 416.920(a)(4)(ii), 416.909. If the answer is no, then the claimant is not disabled. *Id.* at § 416.920(c). If the answer is yes, the analysis proceeds to question three. *Id.* at § 416.920(a)(4).

At step three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of any of the "listed impairments" enumerated in the regulations. 20 C.F.R. § 416.920(a)(4)(iii). *See also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (list of impairments). A claimant who meets the requirements of a "listed impairment" is deemed disabled. 20 C.F.R. § 416.920(d). For claimants who do not meet the requirements of a "listed impairment," the ALJ must then determine the claimant's residual functional capacity ("RFC"). *Id.* at § 416.920(e).

An individual's RFC is his or her ability do work despite the individual's impairments. *Id.* at § 416.945; *see also Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) ("RFC is the maximum that a claimant can still do despite his mental and physical limitations."). "In assessing a claimant's RFC, the ALJ must consider all of the relevant evidence in the record and provide a 'narrative discussion' that cites to specific evidence and describes how that evidence supports the assessment. The ALJ's analysis and discussion should be thorough and '[s]et forth a logical explanation of the effects of the

symptoms, including pain, on the individual's ability to work.'" *Passig v. Colvin*, 224 F. Supp. 3d 672, 680 (S.D. Ill. 2016) (quoting SSR 96-8).

At step four, the ALJ must determine whether the claimant retains the RFC to perform the requirements of their past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(a)(4)(iv), (f). If the answer is no, the analysis proceeds to the final step. *Id.* at § 416.920(a)(4).

At the fifth and final step, the ALJ must consider whether the claimant can make an adjustment to perform any other work considering the claimant's RFC, age, education, and work experience. *Id.* at § 416.920(a)(4)(v). If the claimant can make an adjustment to other work, then the claimant is not disabled. *Id.* at § 416.920(g). Conversely, if the claimant cannot, then the claimant is disabled. *Id.*

Notably, the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). This Court's task is not to determine whether Plaintiff was, in fact, disabled at the relevant time, but instead to determine whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute

its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). "[W]e cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Id.* (internal citations omitted).

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record focuses on the specific medical records and opinions cited in the ALJ's 2018 decision that are the subject of Plaintiff's challenges on appeal (*see* Doc. 29).

I.      *Selected Medical Records and Opinions:*

a.   *Relevant Records/Opinions of Plaintiff's Physical Injuries*

Plaintiff injured his left shoulder during a work-related fall in 2001, which resulted in him undergoing left shoulder surgery in September 2001 (Tr. 841, 1014-1015). In July 2003, Plaintiff injured his right shoulder in another fall at work (Tr. 836). Plaintiff underwent surgery on his right shoulder in February 2004 (Tr. 830-835) and surgery on his right elbow in August 2004 (Tr. 813). Plaintiff also underwent left shoulder surgeries in June and October 2004 (Tr. 902-905). Numerous additional medical records document Plaintiff's prolonged record of physical injuries, pain, and abnormalities (*see generally* Tr. 433-1966).

For instance, the record contains an MRI of Plaintiff's cervical spine that was taken in May 2011 (Tr. 1328-1329). Pertinently, while many of the May 2011 MRI's findings indicated mild or minimal abnormalities, that MRI also found "marked right" foraminal stenoses at C3-4, mild to moderate right foraminal narrowing at C4-5, and mild to moderate right foraminal stenoses at C5-6 (Tr. 1328-29). Consequently, the May 2011 MRI included the impression that Plaintiff had multilevel foraminal stenosis, especially at right C3-4, C4-5, and C5-6 (Tr. 1329).

Notably, in June 2012, Dr. Randall Pass, Plaintiff's family physician, wrote an opinion letter as to Plaintiff's ability to work (Tr. 1500; *see also* 73-74). In that letter, Dr. Pass stated that he had been caring for Plaintiff since 2007 and Plaintiff had been seen for numerous medical problems including chronic pain in the shoulder, neck, and back, depression, low testosterone, hyperlipidemia, and gastric reflux (Tr. 1500). Dr. Pass then stated:

> [Plaintiff] has required the use of narcotic pain medication since at least 2007, and this use is not likely to diminish. He experiences a lot of ongoing pain, and after only an hour or two household chores or similar work, he needs to lie down and rest. Frequent position changes are necessary. Frequent absences of work due to his condition and his need for medical care would be expected. Besides pain medications, he has been to various specialists, as well as a pain management clinic, and no improvement in his condition has been forthcoming.
>
> While many of [Plaintiff]'s complaints are subjective, and difficult to objectively verify, he has had imaging studies which confirm significant disease. For example, an MRI of the cervical spine in 2011 showed multilevel foraminal stenosis.
>
> Due to this ongoing neck and back pain, it is my medical opinion that [Plaintiff] cannot maintain employment in a competitive workplace environment. Therefore, I would ask this his application for permanent disability be granted.

(Tr. 1500).

Additionally, office treatment notes from the date Dr. Pass prepared that opinion letter further document the circumstances surrounding the letter's preparation (Tr. 1658). In that treatment note, Dr. Pass indicated that Plaintiff visited him for the purpose of obtaining an opinion letter (Tr. 1658). At that time, Plaintiff reiterated his medical concerns to Dr. Pass and explained why he believed he could not work (Tr. 1658). The note also indicated that Plaintiff had a diagnosis of chronic pain, and it further specified that Plaintiff requested a pain medication refill, but that issue was going to be addressed at Plaintiff's upcoming appointment on July 9, 2012 (Tr. 1658). The treatment notes form was otherwise largely left blank, other than one marking under "General" which indicated Plaintiff was "WNL," presumably meaning "within normal limits." (Tr. 1658).

### b. *Relevant Mental Health Records/Opinions*

The record also contains numerous records documenting Plaintiff's mental health struggles. Most notably for purposes of this case, the record includes a few reports on Plaintiff's mental health prepared in 2009 by Plaintiff's treating therapist, Gabriel Martin, and treating psychologist, Dr. Naeem Quereshi (Tr. 1059-1068). Those mental health professionals began treating Plaintiff in July 2007 (Tr. 1063). Specifically, their 2009 reports found that Plaintiff had an Anxiety Related Disorder (12.06) that caused marked restriction of activities of daily living; marked difficulties in maintaining social functioning; and repeated episodes of decompensation (Tr. 1060, 1065). They also found that Plaintiff had a Personality Disorder (12.08) that caused marked restriction of activities of daily living; marked difficulties in maintaining social functioning; and

repeated episodes of decompensation (Tr. 1060, 1065). Similarly, their report found Plaintiff had an Affective Disorder (12.04) of depressive syndrome that caused marked restriction of activities of daily living; marked difficulties in maintaining a social functioning; and marked difficulties in maintaining a concentration persistence or pace (Tr. 1061, 1066).

## II.    *2017 Administrative Hearing*:

After this matter was remanded to the Commissioner in 2017, a fourth administrative hearing was held before ALJ Janney on November 20, 2017 (Tr. 93-129).[5] At that hearing, Plaintiff was represented by Attorney Jim Brown (Tr. 93).[6] Vocational Expert Dr. James Bordieri was also present (Tr. 93).

After beginning by discussing some evidentiary matters with Plaintiff's counsel, ALJ Janney indicated his intent to rely on Vocational Expert Matthew Sprong's classification of Plaintiff's past work from the 2014 hearing (Tr. 104). Plaintiff did not object, so those classifications were read into the record as follows:

> It was heating and air conditioning installer/servicer, 637.261-014, medium per the DOT, SVP 7, very heavy as actually performed. And general laborer, 509.687-026, heavy per the DOT, semi-skilled, SVP 3, very heavy as performed. And that precluded the past -- or concludes the past work.

(Tr. 104).

Plaintiff first testified that he had not worked since the prior hearing in 2014 (Tr. 104-105). Plaintiff next described the right shoulder pain he was then experiencing as

---

[5] As previously noted *supra*, this was the second hearing before ALJ Janney (*see* Tr. 93-129, 617-668).
[6] Plaintiff's counsel, Jim Brown, has represented Plaintiff at all four hearings (Tr. 93, 552, 578, 617).

similar to the other pains he was suffering, but occasionally worse (Tr. 105). Plaintiff also discussed the pain he experienced in other parts of his body including his neck and his middle and lower back (Tr. 106-107).

When asked about being prescribed pain medication, Plaintiff testified that he had been taken off the pain medication he was previously prescribed because his doctor left the practice and the new providers refused to provide Plaintiff and other similarly situated patients with refills of their prescription pain medications (Tr. 107-108). Plaintiff indicated his frustration with the situation and stated that he thought the prescription pain medications had worked pretty well, such that he would have continued to take them if he was able to (Tr. 108-109). He also specified that he was taking Aleve every day for his pain (Tr. 108). Plaintiff then stated that he was still being prescribed and taking Prozac for his depression (Tr. 109). Plaintiff's counsel then asked Plaintiff if he believed the pain he was experiencing contributed to his depression, which Plaintiff answered, "without a doubt." (Tr. 110). Plaintiff testified that he had low energy because he frequently wakes up due to the pain he experiences (Tr. 110). As a result of those sleep issues, he wrecked his truck when he fell asleep while driving (Tr. 110).

When asked about his interests, Plaintiff indicated he still was interested in the same things he used to be interested in, but he could no longer do those activities due to his circumstances (Tr. 111). Plaintiff stated he had problems with his mood and anger, and he attributed some of those problems to no longer having the ability to work and make money like he used to (Tr. 111-112). Plaintiff testified that he could no longer work an eight-hour day due to his pain (Tr. 112). Plaintiff also explained that in the past when

he was still working on light duty, he would have to take work breaks so he could lie down, and he similarly takes breaks to lie down every day even though he is no longer working (Tr. 112).

The ALJ then asked Plaintiff if he used alcohol on a regular basis (Tr. 113). Plaintiff answered that he occasionally drinks and does so to the point of intoxication approximately ten times per year (Tr. 113-114). Plaintiff further explained that alcohol use helped with certain symptoms, such as his mood, but it did not alleviate any of his physical symptoms (Tr. 114). And he admitted that he had learned the hard way that alcohol did not help his nerve pain (Tr. 114). In describing that pain, Plaintiff said, "unfortunately you do get used to nerve pain. It becomes not as sharp and lightning effect. It becomes more of a dull, just a horrible ache." (Tr. 115).

Plaintiff also testified that he stopped going to mental health a few months ago because his doctor had quit and he was frustrated with the idea of having to explain his situation to another doctor and start from scratch (Tr. 116). However, Plaintiff then acknowledged, "I really need to get more meds because I just ran out of them and I'm going to go back. I need to go back. I can tell when I'm not doing too good without them." (Tr. 116). Regarding outdoor chores, Plaintiff stated he still occasionally cut the grass for up to 40 minutes using a riding lawn mower, but he then detailed how he had also crashed his mower that summer when he fell asleep while operating it (Tr. 117). As for indoor chores, Plaintiff said he sometimes helps his wife do dishes but, "hardly ever." (Tr. 119).

Plaintiff then discussed his hobbies (Tr. 117-118). He said he had not fished in a long time, other than one recent attempt that he had to abandon after 20 minutes because he couldn't stand it (Tr. 117). As for hunting, he couldn't use a deer stand, was unable to find a combination of sitting and standing that worked, and he had to constantly fidget or move due to pain, tiredness, and frustration (Tr. 117-118). Plaintiff did note, however, that he had an active hunting license and he thought he killed a deer last year, but he relied on his friend to do the field dressing (Tr. 118).

Plaintiff then explained the various ways his symptoms impact his ability to use his arms, from nerves pinching in his arm while driving, to his inability to reach across his body or touch his back, to the difficulty in putting his arms into his sleeves when trying to get dressed (Tr. 119). He also said he was told he had carpal tunnel in both hands, and he dropped things as a result (Tr. 120).

Returning to questions of mental health medication, Plaintiff said he stopped taking Xanax because he thought it was messing with his memory, which was something he was already concerned about because he was taking morphine at that time (Tr. 121). Plaintiff testified that it was pain that prevented him from being able to complete tasks (Tr. 121-122). Consequently, he would try to lie down, stretch, or squat to take breaks when pain prevented him from continuing with a task (Tr. 122). In the first instance of taking such a break, he would usually need 20 to 30 minutes for that break (Tr. 122). However, each time he returned to the task he was attempting, the pain would build up faster, he would need a longer break, and each respective break was less helpful (Tr. 122). As a result, he would give up and save that task for another day (Tr. 122). Plaintiff also

indicated that he could reach out in front of him or to the sides with both arms and he only experienced "a little" pain in doing so, though that pain was different in each arm (Tr. 122-123). Plaintiff's counsel then asked him if he could perform tasks that involved reaching like that for an entire workday, to which Plaintiff definitively answered he could not (Tr. 123).

At that point, Plaintiff's testimony concluded and the ALJ indicated he did not have any questions for Vocational Expert Dr. Bordieri because the hypothetical questions he asked Vocational Expert Sprong in 2014 were the same as the questions he would ask Dr. Bordieri at that time (Tr. 123-124). After Plaintiff's counsel indicated he had no questions for the Vocational Expert, Dr. Bordieri was disconnected from the hearing (Tr. 124). Plaintiff's counsel then provided closing remarks and the hearing concluded (Tr. 124-129).

## THE ALJ'S DECISION

The ALJ's decision followed the five-step analytical framework described above (*see* Tr. 28-77). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since September 15, 2006 (Tr. 34). At step two, the ALJ found Plaintiff had the following severe medical impairments:

> [D]egenerative disc disease of the cervical spine; degenerative disc disease of the lumbar spine with a spontaneously resolved annular tear; left shoulder impingement and AC separation status post acromioclavicular reconstruction with grafting and a partial left claviculectomy; right lateral epicondylitis and olecranon bursitis; right shoulder internal derangement treated with arthroscopic surgery; right shoulder SLAP and superior glenoid labrum lesions on the right; right shoulder impingement; moderate left ulnar neuropathy; right lateral epicondylitis; right ankle tendinitis/right ankle avulsion fracture; level one obesity; late onset

dysthymic disorder; depression; major depressive disorder, recurrent; adjustment disorder with mixed emotional features; anxiety disorder, not otherwise specified; generalized anxiety disorder; social phobia; chronic pain syndrome; personality disorder, not otherwise specified; and history of alcohol abuse.

(Tr. 34-35).

The ALJ also found that the medical evidence established valid diagnoses for low testosterone, hyperlipidemia, gastric reflux/GERD, and foot dermatitis (Tr. 35). However, the ALJ found the medical evidence as to those conditions did not establish more than a slight abnormality or combination of abnormalities, which would have a more than minimal effect on Plaintiff's ability to perform basic work activities (Tr. 35). Additionally, the ALJ found that the medical evidence established valid diagnoses for a finger wound, brachial plexopathy, left great toe pain, and bilateral hand pain (Tr. 35). However, those abnormalities or combination of abnormalities did not last for a period of twelve months and had no more than a minimal effect on Plaintiff's ability to perform basic work activities (Tr. 35-36). The ALJ then explained that Plaintiff had not satisfied all the criteria required to determine that a claimant has the medically determinable impairment of fibromyalgia (Tr. 36-37).

At step three, the ALJ held that Plaintiff's impairments, considered individually or in combination, did not meet or medically equal the criteria of any impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 37-41). Specifically, regarding Plaintiff's degenerative disc disease, the ALJ determined it did not meet listing 1.04 because the record does not demonstrate compromise of a nerve root or the spinal cord with additional required findings (Tr. 38). Likewise, as to Plaintiff's mental impairments, the

ALJ found they do not meet or medically equal the criteria of any listings because they do not result in at least one extreme limitation or two marked limitations in a broad area of functioning (Tr. 39-41). Namely, the ALJ found Plaintiff had only moderate limitations in (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting or maintaining pace (Tr. 39-40); and a mild limitation in adapting or managing oneself (Tr. 40).

Before reaching step four, the ALJ formulated Plaintiff's RFC, finding:

> The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl and occasionally climb ladders, ropes, or scaffolding. He cannot reach overhead with the bilateral upper extremities, but can occasionally reach bilaterally in other directions, and can frequently handle, finger, and feel with the bilateral upper extremities. He can understand, remember, and carry out rote or routine instructions that require the exercise of little independent judgment or decision making for the two hour work segments that make up an 8 hour workday at a consistent pace, but not if the tasks are complex or detailed. He should work in a task or object oriented setting as opposed to a service oriented setting. He may have frequent work related interaction with co-workers, supervisors, but no more than occasional interaction with the public.

(Tr. 41).

The ALJ then proceeded to devote the next 34 single-spaced pages of his decision to discussing the evidence he relied upon in reaching that RFC determination (Tr. 41-75). Rather than summarizing that extensive analysis, the Court instead focuses its discussion on the evidence related to the arguments Plaintiff has raised here.

Significantly, the ALJ's decision summarized the results of the MRI of Plaintiff's cervical spine that was taken in May 2011 (Tr. 47). Specifically, the ALJ stated that "MRI

of the cervical spine showed mild cervical levoscoliosis, mild facet arthropathy, and multilevel degenerative disc disease, multilevel foramina stenosis especially at right C3-4, C4-5, and C5-6, but no cervical cord compression or central canal stenosis." (Tr. 47).

After the ALJ proceeded to discuss many other pieces of evidence in the record, the ALJ moved on to assign weight to the medical findings and opinions contained within the record, including those of Dr. Pass and Dr. Quereshi/Therapist Martin (Tr. 62-75). In considering Dr. Pass's opinion letter, the ALJ found that Dr. Pass had incorrectly described the May 2011 MRI (Tr. 74). Specifically, the ALJ reasoned that the MRI in question "was not described as showing significant disease" and rather, "it described only mild abnormal findings[.]" (Tr. 74). Accordingly, the ALJ determined that Dr. Pass's suggested restrictions to frequent absences and frequent position changes were "incorrect" because they relied on a misinterpretation of the May 2011 MRI (Tr. 74). The ALJ also considered the office treatment note from that same date which included a finding of within normal limits, and reasoned that, "if indeed the claimant was this limited, the corresponding examination should contain abnormal findings that support this extreme degree of limitations." (Tr. 74). The ALJ further took issue with Dr. Pass's limitations because they "directly corresponded" to "the claimant's subjective reporting rather than Dr. Pass opining based upon his examinations of the claimant or other objective evidence." (Tr. 74).

The ALJ also spent a significant amount of time discussing the mental health opinions of Dr. Quereshi and Therapist Martin (Tr. 68-70). Pertinently, the ALJ found that "portions of this opinion were clearly contradictory." (Tr. 68). Most notably, the ALJ

found that the "frequency of [Plaintiff's] treatment did not support marked restrictions in areas of mental health functioning" because Plaintiff typically only saw a mental health professional once, or occasionally twice, a month (Tr. 69). Thus, the ALJ reasoned that Plaintiff "saw his treating mental health professionals infrequently enough that a marked limitation due to mental systems did not appear supported. It would appear he would require mental health treatment from a psychological professional at least weekly if his mental impairments were so pervasive and having such an effect on his life that he had marked limitations in all areas of his mental functioning." (Tr. 69). The ALJ also discredited the mental health professionals' opinions because Plaintiff's "regular treating physicians" generally described Plaintiff's mental functioning as normal on their mini mental status examinations (Tr. 69-70).

The ALJ then challenged Dr. Quereshi and Therapist Martin's treating opinions because they conflicted with their own treatment notes of Plaintiff, which generally described him as cooperative and without any described social difficulties, "despite sometimes appearing irritable or depressed." (Tr. 70). The ALJ further analyzed Dr. Quereshi and Therapist Martin's treatment records, generally explaining that any records/findings which supported their determinations were infrequent or otherwise "intermittently normal." (Tr. 70). As such, the ALJ assigned little weight to their opinions "due to the contradictory nature of the opinion itself and the complete inconstancy" with Plaintiff's other mental functioning and treatment records (Tr. 70).

The ALJ assigned various weights to the opinions of numerous other medical providers and examiners (Tr. 62-75). Thereafter, he summarized his findings as follows:

In sum, although the claimant described disabling symptoms as a result of
medical impairments, the record is not consistent with those allegations.
The above residual functional capacity assessment is supported by the
objective medical evidence, the medical opinions when afforded
appropriate weight, and the claimant's subjective complaints during the
relevant period when taken in proper context. In view of all of the factors
discussed above, the limitations on the claimant's capacities which were
described earlier in this decision are considered warranted, but no greater
or additional limitations are justified.

(Tr. 75).

At step four, the ALJ relied upon the 2014 testimony of Vocational Expert Sprong

to find that Plaintiff was unable to perform past relevant work as actually or generally

performed (Tr. 75, 104; *see also* Tr. 657-658). Lastly, at step five, the ALJ again relied on

the 2014 testimony of Vocational Expert Sprong to find that an individual with Plaintiff's

RFC could perform the requirements of representative occupations such as laminating

machine off-bearer, scaling machine operator, and fruit distributor (Tr. 76; *see also* Tr. 658-

661). The ALJ then confirmed that the 2014 testimony from Vocational Expert Sprong was

consistent with the Dictionary of Occupational Titles and therefore, given Plaintiff's age,

education, work experience, and RFC, he "is capable of making a successful adjustment

to other work that exists in significant numbers in the national economy." (Tr. 77). For

this reason, the ALJ found Plaintiff was not under a disability, as defined by the Social

Security Act, from September 15, 2006, through the date of the decision (Tr. 77).

### ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues (*see* Doc. 29):

1. The ALJ did not give good reasons for discounting the opinions of treating
   doctors Pass and Quereshi/Martin.
2. The ALJ's finding that Plaintiff could "frequently" interact with coworkers

and supervisors is not supported by substantial evidence.
3.  The Commissioner did not adequately carry his step five burden because
    the three-and-a-half-year-old Vocational Expert testimony he was relying
    on was not clearly articulated.

**DISCUSSION**

Plaintiff challenges the ALJ's decision on several grounds. First, Plaintiff contends

that the ALJ erred by failing to provide "good reasons" for discounting the opinions of

treating physicians Dr. Pass and Dr. Quereshi/Therapist Martin (Doc. 29 at pp. 9-13).

Second, Plaintiff argues that the ALJ's finding that he could "frequently" interact with

coworkers and supervisors is not supported by substantial evidence (*Id.* at pp. 13-14).

And third, Plaintiff avers that the Commissioner failed to meet his burden at step five

because the three-and-a-half-year-old vocational expert testimony relied upon by the

Commissioner was not clearly articulated (*Id.* at pp. 14-15). Ultimately, the Court focuses

its analysis on Plaintiff's first contention because that point is dispositive and requires

this matter be remanded.

I.       *The ALJ's Discounting of Favorable Treating Physician Opinions*

Plaintiff argues that the ALJ failed to provide good reasons for discounting the

opinions of several treating physicians including Dr. Pass and Dr. Quereshi/P.A. Martin

(Doc. 29 at p. 9). Consequently, Plaintiff contends that this failure requires reversal (*Id.* at

p. 13). The Court finds these arguments to be persuasive.

Generally speaking, a "treating doctor's opinion receives controlling weight if it is

'well-supported' and 'not inconsistent with the other substantial evidence' in the record."

*Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)).

Additionally, pursuant to 20 C.F.R. § 404.1527(d)(2) (2009), an ALJ must offer "good reasons" in his decision for the weight given to a treating source's medical opinion. Thus, when an ALJ discounts a treating source's medical opinion, the "ALJ must offer 'good reasons' for discounting the opinion of [that] treating physician." *Scott*, 647 F.3d at 739. Moreover, "[i]f an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

   a.  *Dr. Pass's Opinion*

As explained above, the ALJ provided several reasons for affording little weight to Dr. Pass's treating physician opinion (*see* Tr. 73-74). However, for the reasons discussed below, the Court finds the ALJ's proffered reasons, when viewed individually or in combination, do not justify the ALJ's decision to afford little to no weight to Dr. Pass's treating physician opinion.

Most significantly, the ALJ premised a portion of his decision to discredit Dr. Pass's opinion on his belief that the May 2011 MRI "described **only mild** abnormal findings" and Dr. Pass's interpretation of that MRI "was incorrect." (Tr. 74). The ALJ further explained that "this MRI of the cervical spine was not described as showing significant disease." (*Id.*). However, that May 2011 MRI is not as unfavorable to Plaintiff and Dr. Pass's opinions as the ALJ claims. To the contrary, while many of the May 2011 MRI's findings noted only mild or minimal abnormalities, that MRI also found "marked

right" foraminal stenoses at C3-4, mild to moderate right foraminal narrowing at C4-5, and mild to moderate right foraminal stenoses at C5-6 (Tr. 1328-29). Consequently, the May 2011 MRI included the impression that Plaintiff had multilevel foraminal stenosis, especially at right C3-4, C4-5, and C5-6 (Tr. 1329). This is almost exactly what Dr. Pass noted in his opinion, which leaves the Court scratching its head as to why the ALJ found Dr. Pass's interpretation was inaccurate and instead determined that the MRI showed no significant disease[7] and "only mild abnormal findings." (Tr. 74) (citing Tr. 1658). Furthermore, because the ALJ specifically highlighted the MRI's "mild" findings both in his own recounting of that MRI (Tr. 47) and in his criticism of Dr. Pass's analysis (Tr. 74), it was not permissible for him to simply ignore the "marked" finding from that same MRI which was adverse to his decision. *Newman v. Colvin*, 211 F. Supp. 3d 1126, 1131 (N.D. Ind. 2016) ("The ALJ's reliance on certain evidence that supports his decision while failing to address, and potentially failing to even consider, contrary evidence strikes me a classic case of 'cherry-picking' that the Seventh Circuit has denounced time and time again.").

The ALJ provided several other reasons for his decision to afford Dr. Pass's opinion little weight, but none of them salvage his determination. First, the ALJ noted that the office visit treatment note associated with this medical source statement

---

[7] To the extent the ALJ believed that a finding of "multilevel foraminal stenosis" does not constitute a "significant disease," such a determination goes beyond the bounds permitted of an ALJ and into the realm of a doctor. Furthermore, in summarizing the May 2011 MRI, the ALJ expressly stated that "MRI of the cervical spine showed mild cervical levoscoliosis, mild facet arthropathy, and multilevel degenerative disc **disease**, multilevel foramina stenosis especially at right C3-4, C4-5, and C5-6, but no cervical cord compression or central canal stenosis." (Tr. 47) (emphasis added). Put simply, the Court does not know whether multilevel degenerative disc disease or multilevel foramina stenosis constitutes significant disease, and "the ALJ does not know either." *Liskowitz v. Astrue*, 559 F.3d 736, 741 (7th Cir. 2009) (criticizing an ALJ for playing doctor by making a medical determination that, while potentially correct, was something reserved for doctors to determine).

described Plaintiff's physical examination as within normal limits (Tr. 74). However, that treatment note from June 12, 2012 (i.e., over a year after Plaintiff's May 2011 MRI), indicated that Plaintiff was specifically visiting Dr. Pass for a letter for federal disability (Tr. 1658). Furthermore, in that note, Plaintiff indicated he was suffering from chronic pain on a scale of 7 out of 10 (Tr. 1658). The examination portion of that treatment note is left almost entirely blank, other than containing just one check mark indicating "WNL" (presumably, "within normal limits") as to "General." (*Id.*). Pertinently, however, in addition to leaving 19 out of the 20 sections of that portion of the form blank, Dr. Pass's treatment note specifically indicated that he would address Plaintiff's request for pain medication at his next appointment on July 9, 2012 (*Id.*). In other words, that treatment note made it very clear that Dr. Pass was not examining or treating Plaintiff as he would at a normal appointment, and the ALJ's failure to acknowledge such is concerning.

In essence, the ALJ's interpretation of this "appointment" clearly overstates the significance of its lack of findings and ignores the obvious explanation for why no such findings were made at that time. In fact, if the ALJ were to have considered Dr. Pass's treatment notes from Plaintiff's next appointment in July 2012, he would have discovered that at that time Dr. Pass diagnosed Plaintiff with chronic pain, depression, decreased testosterone, increased lipids, refilled his prescription for morphine, and noted that they should consider another scan of Plaintiff's lower back  (Tr. 1657).

Moreover, the ALJ also found Dr. Pass's opinion to be lacking value because it relied on Plaintiff's subjective complaints rather than on examinations or other objective evidence. Undoubtedly, Dr. Pass's medical notes document Plaintiff's self-reported

complaints of pain (*see, e.g.*, Tr. 1657-1658). However, "an ALJ cannot disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record." *Moss*, 555 F.3d at 561. Furthermore, Dr. Pass's opinion letter makes it quite clear that he was also relying on: (1) his years of treating Plaintiff; (2) Plaintiff's extensive medical history for chronic pain; and "imaging studies which confirm significant disease" such as Plaintiff's "MRI of the cervical spine in 2011 [that] showed multilevel foraminal stenosis." (Tr. 1500).

Finally, the ALJ offered one additional – arguably more understandable – explanation as to why he was affording little to no weight to Dr. Pass's opinion. Namely, the fact that Dr. Pass's opinion stated that Plaintiff had been using narcotic pain medication since 2007 and "this use of narcotics was not likely to diminish." (Tr. 73) (citing Tr. 1500). Conversely, as the ALJ noted, Plaintiff testified at the 2017 hearing that he had not been taking narcotics for two years, took Aleve instead, and had "built up a tolerance to the pain." (Tr. 73). Pertinently, however, the ALJ did not explain the reasons Plaintiff provided at the hearing as to why he was no longer taking narcotic pain medication. Most notable of which is the fact that Plaintiff indicated he was no longer taking prescription pain medication because his doctor left the practice, but he thought it had worked and he would have continued to take it if he was able to (Tr. 108). Moreover, the ALJ relied upon Plaintiff's testimony about how his chronic pain had evolved from a "sharp and lightning effect" to a "horrible ache" (Tr. 115) as evidence that Plaintiff "had built up a tolerance to the pain" (Tr. 73), which apparently also discredited Dr. Pass's opinion about Plaintiff's chronic pain. To put it bluntly, even though Plaintiff did admit

that he "got used to" the nerve pain (Tr. 115), the ALJ's interpretation of that admission, which could be interpreted in many ways, clearly goes too far by construing it as an admission that he had built up a tolerance to the pain (Tr. 73). *See Moss*, 555 F.3d at 560 ("An ALJ's conjecture is never a permitted basis for ignoring a treating physician's views[.]"); *Collins v. Astrue*, 324 Fed. Appx. 516, 522 (7th Cir. 2009) ("Dr. Schneider's testimony points equally in opposite directions and therefore cannot serve as substantial evidence to support the ALJ's conclusions.").

Additionally, the ALJ failed to explain how or why Dr. Pass incorrectly predicted Plaintiff's ability to obtain pain medication in the future equated to the conclusion that Dr. Pass's findings as to Plaintiff's disability should be afforded little weight. To be clear, this is not a situation in which Dr. Pass predicted Plaintiff would suffer from chronic pain for the rest of his life, only to have subsequent evidence demonstrate that Plaintiff no longer suffered from pain. Instead, it is a situation wherein the method of treating Plaintiff's pain was altered, to what Plaintiff considered to be a less effective method (Tr. 107-108), for reasons the ALJ did not even mention (Tr. 74).

In summary, none of the explanations offered by the ALJ for affording little to no weight to Dr. Pass's opinion has any merit. Therefore, because the ALJ "failed to articulate any good reason for significantly discounting [Dr. Pass's] medical opinion, his decision is not supported by substantial evidence." *Collins*, 324 Fed. Appx. at 521. Accordingly, reversal is warranted due to this error.

b. *Dr. Quereshi & Therapist Martin's Opinion*

As previously discussed, the ALJ also provided numerous reasons for affording little weight to the opinions of Plaintiff's treating mental health professionals, Dr. Quereshi and Therapist Martin. While the Court need not analyze these points in detail due to the Court's holding above, the Court nevertheless makes the following observations regarding the ALJ's weighing of Dr. Quereshi and Therapist Martin's opinions.

First, the Court takes issue with the ALJ's decision to, at least in part, discredit Dr. Quereshi and Therapist Martin's "marked" restrictions in mental functioning because Plaintiff only saw a mental health professional once, or occasionally twice a month, which the ALJ believed was not frequent enough to support such findings. Pertinently, the ALJ did not cite any medical opinions, evidence, or caselaw, to support his questionable belief that marked mental health restrictions could only be supported in instances where a claimant has been receiving weekly mental health treatment. Such a belief appears to be nothing more than conjecture, and an "ALJ's conjecture is never a permitted basis for ignoring a treating physician's views." *Moss v. Astrue*, 555 F.3d at 560.

Likewise, the Court questions the ALJ's reliance upon the generally normal mental health findings of Plaintiff's general physicians as evidence that the mental health opinions of Plaintiff's mental health providers, Dr. Quereshi and Therapist Martin, should be given little weight (Tr. 69-70). To be clear, the general physician treatment notes the ALJ cited were made by general care providers, surgeons, and orthopedic providers—not mental health physicians (*see* Tr. 1737-1966). As such, the Court questions:

(1) whether those providers were even truly analyzing Plaintiff's mental health at those visits, and (2) why those "mini mental status examinations" made by general providers would outweigh the findings of mental health professionals who were specifically meeting with Plaintiff to evaluate and treat his mental health concerns.

In addition, the ALJ discredited Dr. Quereshi and Therapist Martin's opinions because they were contradictory to their own medical findings. While the Court agrees that such a contradiction would be an adequate reason to discredit Dr. Quereshi and Therapist Martin's opinions, the ALJ did not cite specific records to demonstrate their purportedly inconsistent findings (Tr. 70). In fact, that paragraph of the ALJ's decision contains no citations to the record whatsoever (Tr. 70). Not only is that failure concerning, but the ALJ's own statements indicate that some of Dr. Quereshi and Therapist Martin's records did support their findings such as a "few records over a period of years showing any decreased concentration at all" and that "his most frequent abnormal findings were of a decrease in mood and effect." (Tr. 70). As such, if the ALJ meant to appropriately discredit those findings as outliers, he should have explained why that was the case and cited specific records to make his point, instead of vaguely stating "even these appeared intermittently normal." (Tr. 70). *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability."). By failing to adequately explain his reasoning for crediting some records but not others, the Court is unable to draw a logical bridge from the evidence to the ALJ's conclusions.

The Court wishes to stress that this Memorandum and Order should not be

construed as an indication that the Court believes Plaintiff was disabled or that he should be awarded benefits. To the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## CONCLUSION

The Commissioner's final decision denying Plaintiff's applications for DIB and SSI is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:** March 26, 2026

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**